UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11646-RGS

UNUM GROUP and PROVIDENT LIFE AND
ACCIDENT INSURANCE COMPANY,
Plaintiffs
v.
THE BENEFIT PARTNERSHIP, INC. and MICHAEL P. IPPOLITO
Defendants
v.
AMERICAN NATIONAL INSURANCE COMPANY
Reach and Apply Defendant
v.
FLORENCE SAVINGS BANK,
Trustee Defendant

MEMORANDUM AND ORDER ON UNUM GROUP AND
PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGEMENT

April 11, 2013

STEARNS, D.J.

Plaintiffs Unum Group and Provident Life and Accident Insurance Company (collectively, Unum) brought this action primarily seeking the reimbursement of advance commissions paid to The Benefit Partnership, Inc. (Benefit Partnership) and Michael P. Ippolito in connection with the solicitation of applications for life insurance policies.  In its Verified Amended Complaint, Unum asserts claims for breach of contract (Count I), breach of fiduciary duty (Count II), negligence (Count III), violations of Mass. Gen. Laws ch. 93A (Chapter 93A) (Count IV), reach and

apply (Count V), trustee process (Count IV), and constructive trust (Count VII).[1]
Presently before the court is Unum's motion for summary judgment on the breach of
contract, negligence, and Chapter 93A claims.  A hearing on the motion was held on
March 26, 2013.  For reasons to be explained, the motion will be granted in part and
denied in part.

## BACKGROUND[2]

Unum Group, through its subsidiaries, including Provident Life and Accident
Insurance Company, offers disability, long term care, life, and voluntary insurance
products.  Beginning in May of 2011, Unum entered into a series of agreements with
Ippolito and the Benefit Partnership, a company of which Ippolito was the sole owner
and director, president, treasurer, and secretary.   In the agreements, defendants
contracted to provide a range of services in connection with the sale of a life
insurance product offered by Unum to employees of the Premier Financial Group and

---

[1] The constructive trust claim was added to assert a lien on $50,000 of
commission payments deposited with the Clerk of the U.S. District Court for the
Eastern District of Missouri pursuant to Rule 67.  Because these funds have been
recovered without any need to serve the Clerk, the court deems the claim (Count VII)
to have been voluntarily dismissed.

[2] Ippolito has chosen in this action to exercise his Fifth Amendment privilege
against self-incrimination, while the Benefit Partnership has elected to submit no
evidence in opposition to Unum's motion for summary judgment.  The facts recited
are therefore uncontested.

The People's Ministry.  Unum in turn agreed to pay defendants commissions for issued policies, including advance commissions for the first year that the policies were in force.

Over the next two and a half months, Unum issued 674 policies and advanced defendants $1,213,749.07 in commission payments.  When, according to Unum, it subsequently learned that none of the policy applicants met the eligibility requirements, all of the policies were surrendered or cancelled. Unum then demanded that defendants pay back the advance commissions.  Unum has to date recovered $150,000.  Seeking the return of the remaining $1,063,749.07, Unum filed this lawsuit.

*The Agreements*

The agreements entered into by the parties included an Administrative Services Agreement, a General Agent Contract, an Advance Commission Program Amendment to the General Agent Contract, two Voluntary Workplace Benefits Commission Agreements, and two Enrollment Document of Understanding Voice Recoding Authorizations. Unum entered into the Administrative Services Agreement with the Benefit Partnership on May 17, 2011.  In exchange for a fee, the Benefit Partnership agreed to manage all billing and collection services relating to the insurance policies issued by Unum, including coordinating and collecting the appropriate employer

3

payment or employee payroll deduction and remitting the payments to Unum. *See* Administrative Services Agreement, Preamble. The Benefit Partnership further agreed to defend Unum against any claim, damage, or penalty incurred as a result of its breach of the agreement or because of the gross negligence of its officers, directors, employees, or agents. *See id.* ¶ 4.a.

Two days after the execution of the Administrative Services Agreement with the Benefit Partnership, Unum entered into a separate General Agent Contract with Ippolito. The General Agent Contract authorized Ippolito to solicit and service insurance policies on Unum's behalf. *See* General Agent Contract ¶ 2. Ippolito was also authorized to recruit "subbrokers" to solicit policies and submit applications through him. *Id.* ¶ 4(h). To the extent Ippolito elected to utilize subbrokers, he was required, among other things, to "[s]upervise the Subbrokers with respect to solicitation" and to "[p]rovide reasonable supervision designed to ensure that Subbrokers do not violate any [Unum] policies and procedures or any laws, rules, or regulations of any federal, state or local government, department or bureau having jurisdiction." *Id.* ¶¶ 4(h)(2), 4(h)(4). Ippolito was also required to screen applications submitted to him for completeness. *Id.* ¶ 4(h)(6). Ippolito did not have the authority to modify or waive any of the terms or conditions of the applications or policies without Unum's written consent. *Id.* ¶ 5(a).

4

Ippolito was eligible to be paid a commission on each policy he brought to Unum.  Pursuant to an Advance Commission Program Amendment to the General Agent Contract, Provident Life agreed to advance Ippolito 40% of his share of the annualized first year commission at the time a policy was issued.  *See* Advance Commission Amendment ¶ 1.  Under a clawback provision of the agreement, Ippolito was required to "[p]romptly repay to [Unum] (1) any compensation paid on policies which are rescinded with a return of premiums and (2) any compensation advanced by [Unum] with respect to policies returned during any applicable 'right to examine' period."  General Agent Contract ¶ 4(e).  Ippolito was required to "refund pro-rata to [Unum] compensation on premiums refunded for any reason at the same rate at which compensation was originally paid."  *Id.* ¶ 7.  Ippolito further acknowledged in the Advance Commission Program Amendment that the amounts advanced to him were subject to a right of setoff for any amounts owed by him to Provident Life, and were subject to a lien by Provident Life against any indebtedness owed by him pursuant to the General Agent Agreement.  Advance Commission Program Amendment ¶ 1.  The agreement specified that indebtedness included any advances to Ippolito of first year commissions, interest, and any collection expenses, including attorney's fees in the event legal action was required to collect indebtedness.  *Id.* ¶¶ 1, 7; *see also id.*  ¶¶ 4-5 (explaining interest calculation).

5

Also on May 19, 2011, Unum and Ippolito entered into a Voluntary Workplace Benefits Commission Agreement, pursuant to which Ippolito agreed that commissions with respect to policies issued by Unum for Premier Financial Group would be split between him and the Benefit Partnership. A similar agreement was entered into on July 20, 2011 with respect to The People's Ministry. Correspondence between Ippolito and Unum later confirmed that the Benefit Partnership was to receive 100% of the commissions generated from the states in which it was licensed, and Ippolito was to receive 100% of the commissions from the remaining states.

In anticipation of the offerings at Premier Financial Group and The People's Ministry, Unum prepared plan offerings detailing the plans' eligibility requirements and coverage. A Plan Offering for voluntary benefits for the Premier Financial Group employees (Premier Plan Offering), prepared by Unum on April 20, 2011, indicated that the offering was limited to full time employees, defined as employees "actively at work for a minimum of 20 hours per week . . . [and] actively at work at the time of application." Premier Plan Offering at 3. The Premier Plan also stated Unum's understanding, based on information provided by the Benefit Partnership and Ippolito, that Premier Financial Group had 550 employees, all of whom were eligible to enroll in the voluntary benefits plan. The Plan Offering for The People's Ministry (The People's Ministry Offering) prepared on June 24, 2011, incorporated the same

full-time, active work requirement. *See* People's Ministry Offering at 3. The offering conveyed Unum's understanding that The People's Ministry had 750 employees, of whom 700 were eligible to enroll. *Id.* at 1.

Unum also entered into two identical letter agreements with the Benefit Partnership entitled Enrollment Document of Understanding Voice Recording Authorization (collectively, Enrollment DOU), which set forth the terms under which the Benefit Partnership agreed to communicate with and enroll potential applicants through the Benefit Partnership's call center. Pursuant to the terms of the Enrollment DOU, the Benefit Partnership was required to record each conversation in the application process and to ask the employee questions using a call center script approved by Unum. Enrollment DOU at 2, Section B. The script asked applicants to confirm eligibility for coverage by providing, among other things, the name of their employer and the scheduled number of hours they worked. The Benefit Partnership assumed "full responsibility and liability" for "collecting and submitting to Unum complete, accurate[,] and compliant data." *Id.* at 4, Section H. The DOU provided that "[i]n the event any misrepresentation occurs or incorrect data is transmitted and processed as a result of information provided by The Benefit Partnership, The Benefit Partnership will be held fully responsible and will be required to take all necessary steps to correct the situation." *Id.* at 4, section I.

*Applicant Ineligibility*

The Benefit Partnership and Ippolito submitted applications for 634 individuals through the Premier Financial Group Offering and 40 individuals through The People's Ministry Offering.  In anticipation of payment of the first-year commissions on these policies, Unum advanced $1,213,749.07 to Ippolito and the Benefit Partnership pursuant to the Commissions Agreements.

Before the enrollment period for The People's Ministry was complete, Unum became concerned when investigators from ING Insurance Company notified Unum that ING was investigating Ippolito for possible fraud in connection with applications he had submitted for insurance though ING.  As a result, Unum undertook its own investigation of the applications it had received through Ippolito.

Over the course of the investigation, Unum conducted over 500 interviews of putative applicants.  Nearly all of the applicants interviewed confirmed that they did not meet the eligibility requirements for the policies, some because they were not actually employed by the Premier Financial Group or The People's Ministry, others because they had been recruited to pose for applicants who were unable to meet the eligibility requirements.  Call center recordings obtained by Unum confirmed that subbrokers not only deviated from the approved call center enrollment script but also

consistently coached applicants as to how the applications should be completed so as to misrepresent eligibility for coverage.

The investigation further revealed that the subbrokers required The People's Ministry applicants to list The People's Ministry as a 50% co-beneficiary under the policy.  In the case of the Premier Financial Group offering, applicants were required to list as a 50% co-beneficiary 4HIM Ministries, whose president, Giovanni Santiago, was also the CEO of Premier Financial Group and the person with whom Ippolito dealt at the time of the offering.  Investigators learned that more than $1,000,000 of the advance commissions were transferred from a Benefit Partnership bank account to Sin Agua, a company owned and operated by Santiago.  Unum was unable to obtain an explanation for the transfers from either Ippolito or Santiago.  In July of 2010, Santiago was indicted in the U.S. District Court for the Eastern District of Missouri on multiple counts of wire and mail fraud arising out of an alleged Ponzi scheme.

On August 5, 2011, Unum sent a letter to Ippolito and the Benefit Partnership setting out the investigators' findings and notifying them that it was immediately terminating the Agreements.  The letter further stated that Unum was withdrawing its underwriting offers, would not accept any further applications or issue any policies on applications previously received, and would be investigating applications on

which policies had been issued with a view to rescinding policies that had issued on incorrect data or misrepresentations.  Unum also demanded the return of all advance commission payments, stating that "[b]ecause the policies and any coverage will likely be rescinded, no premium is payable and the commissions are therefore unearned and not payable."  Wade Aff. - Ex. A.  A total of 146 insureds voluntarily called Unum to cancel their policies upon learning of Unum's investigation.  Unum cancelled all of the remaining policies when the applicants failed to respond to a letter from Unum requesting proof of employment.

Following the request for repayment, the Benefit Partnership and/or Ippolito repaid $100,000 of the total $1,213,749.07 in advance commissions.  Unum has recovered an additional $50,000 in proceeds that were held by the U.S. District Court for the Eastern District of Missouri in connection with the criminal case against Santiago.  The Benefit Partnership and Ippolito have not returned the remaining $1,063,747.07.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the

outcome of the case." *Calero-Carats v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.

2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).  A party

seeking summary judgment bears the initial burden of demonstrating that there is no

genuine issue as to a material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986).  If this is accomplished, the burden "shifts to the nonmoving party to establish

the existence of an issue of fact that could affect the outcome of the litigation."

*Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).   To oppose the motion

successfully, the nonmoving party "may not rest upon the mere allegations or denials

of his pleading."  *Anderson*, 477 U.S. at 256.   Rather, the nonmovant must submit

"'sufficient evidence supporting the claimed factual dispute' to require a choice

between 'the parties' differing versions of the truth at trial.'"  *LeBlanc v. Great Am.

Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), quoting *Hahn v. Sargent*, 523 F.2d 461, 464

(1st Cir. 1975).   The court is obligated to view the entire record "in the light most

flattering to the nonmovant" and indulge "all reasonable inferences in that party's

favor."  *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).

## DISCUSSION

*Ippolito's Invocation of the Fifth Amendment*

Ippolito has elected to exercise his Fifth Amendment privilege against self-

incrimination and, consequently, has refused to answer any questions related to the

allegations made in Unum's Complaint.  Unum argues that the court should draw an

adverse inference against Ippolito based on his invocation of the privilege.

It is settled law that a trier of fact may draw an adverse inference in a *civil*

action against a party who invokes the Fifth Amendment privilege.  S*ee Baxter v.*

*Palmigiano*, 425 U.S. 308, 318-319 (1976).  Some courts, however, have declined to

draw such an inference in evaluating evidence for purposes of deciding a summary

judgment motion.  As one court explained:

> [T]he evidence produced by a nonmoving party's silence is not
> sufficiently weighty to carry a moving party's burden in a motion for
> summary judgment.  In other words, the plaintiff's motion for summary
> judgment must stand or fall on the merits of the evidence adduced. . . .
> The propriety of drawing an inference against the defendants in this
> action based on their invocation of the privilege is especially
> problematic in the context of a motion for summary judgment, where a
> court is admonished to construe all evidence, including the defendants'
> silence, in a light most favorable to the non-moving party.

*Fidelity Funding of California, Inc. v. Reinhold*, 79 F. Supp. 2d 110, 116-117

(E.D.N.Y. 1997) (citation omitted); *see also Stichting Ter Behartiging Van de*

*Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v.*

*Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) ("Even assuming that a *jury* might draw

such inferences, . . . *we* are required at summary judgment to draw all reasonable

inferences in favor of the non-moving party . . . . [Thus], we cannot conclude that [the

nonmoving party's silence resolves all genuine issues of fact . . . .").

It is an open question whether the law of the First Circuit would permit an adverse inference to be drawn at summary judgment from a party's silence. *See In re Marrama*, 445 F.3d 518, 522-523 (1st Cir. 2006) (expressing "reservations" about drawing an adverse inference against the nonmoving party at the summary judgment phase, but finding it unnecessary to resolve the issue because of other evidence supporting the entry of summary judgment). The court need not venture an opinion here, however, because this much is clear: even when permitted at the summary judgment stage, an adverse inference, standing alone, is not sufficiently conclusive evidence to satisfy a moving party's burden. *See LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389-394 (7th Cir.1995) (holding that an adverse inference is permissible from nonmoving party's invocation of the Fifth Amendment right in reply to a summary judgment motion, but only when that invocation is supplemented with independent evidence of the fact to which the nonmoving party refuses to answer); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 675 (5th Cir. 1999) (same); *S.E.C. v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998) (same). Thus, even were the court to draw an adverse inference from Ippolito's invocation of the Fifth Amendment, it would not relieve Unum of its burden of demonstrating that independent evidence in the record confers judgment as a matter of law.

Equally true, however, is the converse: invocation of the Fifth Amendment

does not relieve Ippolito of his own burden on summary judgment.  A litigant claiming the privilege is not "freed from adducing proof in support of a burden which would otherwise have been his." *United States v. Rylander*, 460 U.S. 752, 758 (1983).  Put another way, "a 'party who asserts the privilege must bear the consequences of lack of evidence,' *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992), and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *United States v. Certain Real Prop. and Premises Known as: 4003-4005 5th Ave, Brooklyn, NY*, 55 F.3d 78, 83 (2d Cir. 1995), citing 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2018 (2d ed. 1994).  As discussed below, the failure of either Ippolito or the Benefit Partnership to offer such evidence proves fatal to their defense.

*Unum's Claims*

> *Breach of Contract (Count I)*

While Unum asserts that Ippolito and the Benefit Partnership breached numerous provisions of the agreements they entered into with Unum, the essence of Unum's breach of contract claims is that defendants have failed to return the full amount of advance commissions paid to them on policies that were surrendered or cancelled.  To succeed on this count, Unum must prove with respect to each

14

defendant: (1) the existence of an agreement supported by consideration; (2) that Unum performed its obligations under the agreement; (3) that the defendant breached the agreement; and (4) that Unum suffered injury as a result.[3]  *See, e.g.*, *Singarella v. Boston*, 342 Mass. 385, 387 (1961).

Defendants contest only the element of breach.  Moreover, because Ippolito has chosen to exercise his Fifth Amendment privilege and the Benefit Partnership has elected to submit no evidence in opposition to Unum's motion, their defense is reduced to arguing that there are weaknesses in Unum's marshaling of its own evidence.  The argument fails to convince.

The Advance Commission Agreement required Ippolito to repay advance commissions on policies refunded for any reason, *see* General Agent Contract ¶¶ 4(e), 7, which the opening facts outlined above plainly establish he has failed to do.  In an attempt to stave off the obvious conclusion that he was therefore in breach of contract, Ippolito argues that there is no evidence that *he* submitted any of the

---

[3] In both its Complaint and summary judgment briefing, Unum tends to treat Ippolito and the Benefit Partnership as one and the same, referring to breaches of agreements signed only by one defendant as having been committed by both.  Given the rather blurred lines of demarcation between Ippolito and his corporation, the temptation to do so is clear.  Unum has not, however, argued for a piercing of the corporate veil.  *See My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968).  It must therefore prove the elements of breach of contract with respect to each party separately.

applications for life insurance from the Premier Financial Group or The People's Ministry or that any commission was paid to *him*. Defs.' Resp. to Pls.' Statement of Material Facts Nos. 19, 20.  Highlighting that the total $1,213,749.07 in advance commissions was deposited into a bank account held solely in the name of the Benefit Partnership, Ippolito contends that there are no facts that he received "as much as one dime" from Unum: "The Plaintiffs' money trail, at most, shows Unum paid money to an account of The Benefit Partnership. . . . Further, there is no evidence that The Benefit Partnership advanced any of that [money] to Mr. Ippolito."  Defs.' Opp'n at 5-6.

The record evidence belies Ippolito's contentions.  A report kept in the ordinary course of Unum's business details the breakdown of advance commission payments and establishes that $1,053,423.83 of the total advance commissions was credited to Ippolito and $160,325.24 was credited to the Benefit Partnership (based on the sharing formula set out in the Voluntary Workplace Benefits Commission Agreements).  Supp. Aff. of Drew C. Heisig ¶ 7 & Ex. C.  The full $1,213,749.07 was deposited into a Benefit Partnership account only on Ippolito's instruction.  *Id.* ¶ 7. Unum is thus entitled to summary judgment on its breach of contract claim against Ippolito.

Unum's proffer also establishes that the Benefit Partnership breached, at a

minimum, the Enrollment DOU.[4]   Unum's investigation revealed no shortage of "misrepresentation" and "incorrect data" for which the Benefit Partnership is liable pursuant to the terms of that agreement.   *See* Enrollment DOU at 4, Section H (establishing that the Benefit Partnership bore "full responsibility and liability" for "collecting and submitting to Unum complete, accurate[,] and compliant data"); *id.*, Section I ("In the event any misrepresentation occurs or incorrect data is transmitted and processed as a result of information provided by the Benefit Partnership, the Benefit Partnership will be held fully responsible and will be required to take all necessary steps to correct the situation.").   Although the Benefit Partnership cursorily claims that there is no "proper proof" that any of the applications were false, Unum's submission of a sworn affidavit based on the personal knowledge of the Federal Crimes Manager of Unum's Special Investigative Unit outlining the results of Unum's investigation plainly satisfies the Rule 56(c) standard.   *See* Aff. of Charles H. Wade.

---

[4]  The evidence underpinning Unum's claim that Ippolito failed to return advance commissions applies equally to the Benefit Partnership.  But, while the Benefit Partnership was designated in the Voluntary Workplace Benefits Commission Agreements to receive advance commissions on policies sold in states where it was licensed, it was not a party to the Advance Commission Agreement requiring the repayment of advance commissions on refunded policies.  The court therefore looks only to those agreements to which the Benefit Partnership was a party.

In sum, Unum has fulfilled its burden of proving the elements of breach of contract, while Ippolito and the Benefit Partnership have not met their burden of raising any material dispute of fact that would require resolution by a jury. Therefore, the motion for summary judgment will be allowed as to the breach of contract claim.

*Negligence (Count III)*

Unum claims that by failing to supervise their subbrokers to ensure that appropriate procedures were followed in enrolling applicants, Ippolito and the Benefit Partnership were negligent, and that the negligence caused Unum harm. In support of its position, Unum relies on *St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372 (1998), a case in which the Supreme Judicial Court held that an independent insurance broker acting on behalf of the insured could be found liable in tort (and under Chapter 93A) to an insurer "which issued a policy based on material misinformation that the broker, negligently or with reckless disregard for the truth, placed on an insurance application, where the broker knew, or reasonably should have known, that disclosure of the truth would have led the insurer to reject the application." *Id.* at 377. By analogy, Unum contends that had defendants exercised reasonable care in their oversight of the application process, they would have known that the applicants being recruited were not eligible, and that

Unum, being made aware of such, would not have issued the policies or paid the advance commissions to the defendants.

It is doubtful that *St. Paul* provides a basis for negligence liability because of the contractual relationship between Unum and defendants. "The traditional economic loss rule provides that, when a defendant interferes with a contract or economic opportunity due to negligence and causes no harm to either the person or property of the plaintiff, the plaintiff may not recover for purely economic losses." *Garweth Corp. v. Boston Edison Co.*, 415 Mass. 303, 305 (1993); *see also F.M.R. Corp. v. Boston Edison Co.*, 415 Mass. 393, 395 (1993) (reaffirming that, absent a showing of personal injury or physical damage to property, the economic loss doctrine ordinarily bars the recovery of economic losses incurred because of another's failure to execute a contract according to its terms). Where parties enjoy a contractual relationship, the economic loss rule is "founded on the theory that parties to a contract may allocate their risks by agreement and do not need the special protections of tort law to recover for damages caused by a breach of the contract." *South Carolina Elec. & Gas Co. v. Westinghouse Elec. Corp.*, 826 F.Supp. 1549, 1557 (D.S.C. 1993). *But see Arthur D. Little Int'l., Inc. v. Dooyang Corp.*, 928 F. Supp. 1189, 1203 (D. Mass. 1996), citing *Abrams v. Factory Mut. Liab. Ins. Co.*, 298 Mass. 141, 144 (1937) (suggesting that Massachusetts law might allow recovery where the negligence

alleged is in the manner of performing a contractual duty as opposed to a mere failure to perform).  The court need not resolve the issue, however, because as in *Arthur D. Little*, the extent of any claim for negligence damages is measured by, and limited to, the terms of the contract.  *See id*. at 1203.  Unum, in other words, is not permitted to recover in both contract and tort for the same harm.  *See Smith v. Jenkins*, 718 F. Supp. 2d 155, 168 n.20 (D. Mass. 2010); *Arthur D. Little*, 928 F. Supp. at 1203 n.4. Consequently, Unum's motion for summary judgment on the negligence claims will be denied.

*Chapter 93A (Count IV)*

Finally, Unum asserts that Ippolito and the Benefit Partnership violated Chapter 93A by "fail[ing] to manage [the enrollment] process, and indeed, by all appearances, facilitat[ing] applications from unqualified applicants." Pls.' Mem. 16-17.  Under Chapter 93A, a person "who engages in the conduct of any trade or commerce" may bring an action for damages or other relief against another party who, in the course of his trade or business, engages in an "unfair method of competition or an unfair or deceptive act or practice." Mass. Gen. Laws ch. 93A, § 11.  Although the statute does not define "unfair" or "deceptive," Massachusetts courts have recognized that "[a] practice is unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or

unscrupulous; and causes substantial injury to other businessmen." *Kenda Corp., Inc. v. Pot O'Gold Money Leagues,* Inc., 329 F.3d 216, 234, quoting *Linkage Corp. v. Trs. of Boston Univ.*, 425 Mass. 1, 27 (1997). The statute permits the award of double or treble actual damages for "willful or knowing violation[s]." Mass. Gen. Laws ch. 93A, § 11.

Although "mere breaches of contract, without more, do not violate chapter 93A," *Pepsi-Cola Metro. Bottling Co. v. Checkers*, *Inc.*, 754 F.2d 10, 18 (1st Cir. 1985), this case involves more than a simple breach of contract. The evidence presented here – specifically, the sheer number of applicants who were ineligible for coverage (almost all of them), the subbrokers' coaching of applicants to misrepresent eligibility and their demand that 4HIM Ministries or The People's Ministry be listed as co-beneficiaries under the policies, and defendants' refusal to return advance commissions on policies cancelled or surrendered, coupled with the transfer of a substantial portion of those commissions to a company owned and operated by a third-party (Santiago) – leaves only one plausible inference, that of bad faith and improper motive. Without countervailing facts to undercut this inference, no reasonable jury could doubt that defendants knowingly or recklessly submitted or caused the submission of false applications.

Whatever its applicability to Unum's negligence claim, *St. Paul* plainly supports the imposition of Chapter 93A liability in these circumstances. *See St. Paul,* 427 Mass. at 376 (imposing Chapter 93A liability where the evidence permitted an inference that misrepresentations on an insurance application were intentional); *cf. James R. Marshall vs. Stratus Pharm., Inc.*, 51 Mass. App. Ct. 667, 767 (2001), citing *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979) ("[I]f X ordered goods and services from Y and thereby induced Y to work, all the while never intending to pay for the labor and materials, Y would have a [Chapter] 93A action against X). Furthermore, because defendants' conduct was willful or knowing, an award of multiple damages and attorneys' fees may well be warranted. *See St. Paul,* 427 Mass. 372 at 376; *see also Shaw v. Rodman Ford Truck Ctr., Inc.*, 19 Mass. App. Ct. 709, 711-712 (1985) (describing a "willful or knowing" violation as one where either the defendant affirmatively knew that a material representation was false or made the representation with reckless disregard of its truth or falsity).

Defendants demur, maintaining that Unum offers no credible evidence to show that Ippolito or the Benefit Partnership engaged in any activity "primarily and substantially within the commonwealth," as required by the statute. Mass. Gen. Laws ch. 93A, § 11. As the remainder of the statute's text makes clear, however, "the burden of proof shall be upon the person claiming that such transactions and actions

22

did not occur primarily and substantially within the commonwealth." *Id.*  Beyond stating that both Unum Group and Provident Life and Accident Insurance Company are not Massachusetts corporations, and that applicants for the cancelled policies may have come from various states, Ippolito and the Benefit Partnership offer no evidence to support the claim that their activities occurred outside Massachusetts.  Ippolito was at all relevant times a Massachusetts resident and the Benefit Partnership was incorporated under the laws of Massachusetts and had its principal  place of business in Massachusetts.  The advance commissions were paid to and withdrawn from a Massachusetts bank.  The "center of gravity of the circumstances that give rise to the claim" is thus within the Commonwealth.  *See Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 472-474 & n.13 (2003).

## ORDER

Unum's motion for summary judgment is <u>ALLOWED</u> on its breach of contract and Chapter 93A claims.  Summary judgment on the negligence claim is <u>DENIED</u>. The Clerk will enter judgment for Unum on Counts I and IV of its Complaint.  Should Unum elect to voluntarily dismiss Counts II and III, the Clerk will schedule an assessment of damages hearing on Counts I and IV. Unum will have twenty-one (21) days from the date of this Order to advise the court as to whether it wishes nonetheless to proceed on Counts II and III.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE